**UNITED STATES of America**

**v.**

**Randall TERRY, Defendant.**

**No. 92 Cr. Misc. # 1 Pg. 46(RJW).**

United States District Court, S.D. New York.

Nov. 20, 1992.

---

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Sanford M. Cohen, Edward D. Saslaw, Robert R. Reed, Shelley B. Mayer, Asst. Attys. Gen., Mary Ellen Burns, Chief Asst. Atty. Gen., of counsel), for U.S.

Jay Alan Sekulow, Washington, D.C. (Patrick Monaghan, John Stepanovich, of counsel), for defendant.

## OPINION

ROBERT J. WARD, District Judge.

Defendant Randall Terry served and filed nine separate motions in connection with his forthcoming criminal contempt trial before this Court. At oral argument on September 24, 1992 and in a subsequent opinion, *United States v. Randall Terry*, 802 F.Supp. 1094 (S.D.N.Y.1992) ("the October 6 Opinion"), this Court disposed of eight of these motions and deferred decision on one motion, the Motion to Disqualify the [New York State] Attorney General from Appointment as Prosecutor ("the Motion to Disqualify"), pending further submissions to the Court and, if necessary, an evidentiary hearing. The Attorney General of the State of New York ("the Attorney General") opposes the Motion to Disqualify. For the reasons hereinafter stated, the Motion to Disqualify is denied.

## BACKGROUND

The underlying facts and general procedural history of this action are described in the October 6 Opinion and the Court assumes familiarity with that decision.

At a contempt hearing held on July 16, 1992 ("the July 16 Hearing"), the Court noted that it had previously imposed coercive civil contempt fines on Terry in a related civil matter, 88 Civ. 3071 (RJW), and that "these fines have had no effect." July 16 Hearing Transcript at 8. For this rea-

son, the Court, *sua sponte*, indicated that, if it was proved that Terry violated this court's preliminary injunction issued July 13, 1992 ("the July 13 Preliminary Injunction"), the imposition of criminal sanctions, rather than civil sanctions, would be appropriate.

Pursuant to the instructions of the Supreme Court in *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801–02, 107 S.Ct. 2124, 2134–35, 95 L.Ed.2d 740 (1987), this Court referred the matter to the United States Attorney for the Southern District of New York. The United States Attorney subsequently declined to prosecute the alleged criminal contempt and "suggest[ed] that the Court consider appointing a private attorney to prosecute the putative contumacious conduct pursuant to Rule 42(b) of the Rules of Criminal Procedure." Letter of August 3, 1992 from Otto G. Obermaier, United States Attorney to Hon. Robert J. Ward.

At a hearing on August 5, 1992, this Court, on its own initiative, inquired whether the Attorney General would be agreeable to appointment to prosecute the alleged criminal contempt by Terry. The Attorney General responded in the affirmative, whereupon the Court appointed the Attorney General to prosecute this matter. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. at 793–801, 107 S.Ct. at 2130–2134 ("[I]t is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt." *Id.* at 793, 107 S.Ct. at 2130.).

At the same hearing, the initial charge of civil contempt against Terry, which had been brought on by an order to show cause signed by this Court on July 15, 1992, was dismissed. Transcript of Proceedings of August 5, 1992 at 5. The order to show cause why the eight remaining defendants[1] should not, *inter alia*, be held in civil contempt of the July 13 Preliminary Injunction

("the civil contempt proceeding") is still pending.

Following appointment of the Attorney General to prosecute the criminal contempt, plaintiff filed the instant Motion to Disqualify. In support of his motion, Terry filed a declaration stating, in relevant part:

2. I did attend a pro-abortion rally held on the Mall in Washington, D.C., on April 5, 1992, for the purpose of expressing the opposing pro-life viewpoint.

3. The Attorney General of the State of New York, Robert Abrams, also attended that rally. When he saw me he walked over to me and began loudly chanting, "you are going to lose." He then emphasized his enmity toward me by lodging his thumbs in his ears, wriggling his fingers, and sticking out his tongue.

Declaration in Support of Motion to Disqualify ¶¶ 2–3 ("the Terry declaration").

At the September 24 oral argument on the Motion to Disqualify, the Attorney General took the position that the alleged events described in the Terry declaration were "irrelevant," arguing that "[w]hat has been described in Mr. Terry's papers is an innocuous passing of two men at a large rally in Washington and it has no bearing on this matter whether the Attorney General in fact can maintain the appropriate impartiality in pursuing the responsibilities that this Court has appointed him to fulfill." September 24 Hearing Transcript at 21–22.

The Court then expressed its view that the alleged incident described in the Terry declaration was, indeed, relevant to defendant's motion, *id.* at 22, and invited the parties to file any additional affidavits and supplemental submissions on the law.

On September 29, 1992, Robert Abrams, Attorney General of the State of New York, filed an affidavit describing the events at the rally on April 5, 1992 and asserting, *inter alia*, that "[a]t no time did I engage in any of the activities alleged in paragraph 3 of the Affidavit of Randall Terry, dated August 20, 1992. His allega-

---

**1.** At present, these defendants are Keith Tucci, Patrick Mahoney, Joseph Foreman, Operation Rescue National, Missionaries to the Pre–Born, Youth for America, Robert L. Schenck and Harley Belew.

tions are patently false and ridiculous." Affidavit of Robert Abrams in Opposition to Motion to Disqualify ¶ 10. In addition, Diane Schulder Abrams, the wife of Robert Abrams, filed an affidavit describing her participation in the April 5, 1992 rally and stating, *inter alia*, that, "[a]t no time did I see my husband engage in any of the activities alleged in paragraph 3 of the Affidavit of Randall Terry, dated August 20, 1992." Affidavit of Diane Schulder Abrams in Opposition to Motion to Disqualify ¶ 7.

Terry subsequently filed a declaration by Jeff White in which the declarant claimed:

2. I was present with Randall Terry at a pro-abortion rally held on the Mall in Washington, D.C., on April 5, 1992.

3. At a certain point during that demonstration I saw a bald headed man in a suit approach Mr. Terry and loudly chant, "you are going to lose." The man then lodged his fingers in his ears and stuck out his tongue at Mr. Terry.

4. Although at the time I did not know who this individual was, I have subsequently come to learn through seeing a photograph that the man who stuck his tongue out at Mr. Terry is Robert Abrams, the Attorney General of the State of New York.

Because (1) the affidavits in opposition directly contradict the declarations in support and (2) the declarations in support, if true, suggest that the Attorney General *may* harbor personal animosity against Terry, this Court held an evidentiary hearing on November 18, 1992 in order to make factual findings concerning the events of April 5, 1992 and, as a corollary, to evaluate defendant's claim that Abrams harbors a personal animosity toward him.

## DISCUSSION

■ It is uncontested by the parties that a federal court may not appoint an interested party to prosecute a charge of criminal contempt.[2] The disputed question presently before this Court is whether the Attorney General of the State of New York should be categorized as an "interested party," thereby requiring his disqualification in the instant matter. Defendant answers this question in the affirmative for three reasons:

(1) "the Attorney General is involved in the concurrent civil litigation pending before this Court";

(2) "the Attorney General stands to gain financially if the People prevail on the 42 U.S.C. § 1985(3) causes of action in the civil litigation;" and

(3) "Robert Abrams fosters personal animosity for Randall Terry which he has expressed publicly".

Memorandum in Support at 1–2.

The first two arguments for disqualification put forward by defendant may be classified as relational, because these arguments are based on the position the Attorney General occupies in relation to the underlying civil litigation and the concurrent civil contempt proceeding. These claims fall squarely within the framework of analysis established by *Vuitton* and its progeny. Terry's third claim, however, is fundamentally distinct, in that it asserts that Abrams harbors a *personal* prejudice against Terry, thereby requiring the disqualification of Abrams, as an individual, and, by extension, the office he heads.[3] Under his third claim, Terry asserts that, even if the Attorney General had no in-

---

**2.** Indeed, this prohibition is codified for United States attorneys and their staffs with respect to all investigations and prosecutions:

The Attorney General [of the United States] shall promulgate rules and regulations which require the disqualification of any ... United States attorney or a member of such attorney's staff[ ] from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance thereof.

28 U.S.C. § 528.

**3.** In order to avoid confusion when discussing Terry's logically distinct arguments for disqualification, the term "Attorney General" is used throughout this opinion in an institutional sense and refers to the *office* of the Attorney General of the State of New York, including relevant staff members in that office. When discussing the alleged personal prejudices of the prosecutor in this matter, the Court refers to the Attorney General by his name, "Robert Abrams" or "Abrams", rather than his title.

volvement with the related civil litigation, he should still be disqualified.

## A. *Disqualification Because of the Attorney General's Involvement in the Related Civil Litigation*

The central case concerning the appointment of an allegedly "interested" party to bring a criminal contempt prosecution when that party is involved in related civil litigation is *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), in which the Supreme Court held that counsel for a party that is the beneficiary of a federal court order may not be appointed by a federal court to bring a charge of criminal contempt for an alleged violation of the underlying court order. The *Vuitton* court's authority to make this determination derived from its general supervisory power over federal prosecutions in federal courts, and was not based on constitutional due process considerations. *See Sassower v. Sheriff of Westchester County*, 824 F.2d 184, 191 (2d Cir.1987) (noting that only Justice Blackmun believed that the practice of appointing an interested party as counsel to prosecute for criminal contempt is a violation of due process).

■ In the instant matter, the Attorney General has participated in: (1) the underlying civil litigation, wherein the Attorney General sought and obtained the July 13 Preliminary Injunction; and (2) the pending civil contempt proceedings, in which it is alleged that other individuals and organizations violated the July 13 Preliminary Injunction. A careful review of the Supreme Court's reasoning in *Vuitton* leads to the conclusion that neither *civil* proceeding compels the Attorney General's disqualification from Terry's *criminal* contempt proceedings.

The United States Attorney is pursuing public, not private, interests when he appears in Court. As the *Vuitton* court explained,

"[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer."

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. at 803, 107 S.Ct. at 2135 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)).

■ Rather than representing the interests of a private party, the Attorney General acts *parens patriae*, asserting a "quasi sovereign" interest for the common good of the people of the State of New York. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600–08, 102 S.Ct. 3260, 3265–69, 73 L.Ed.2d 995 (1982); *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 38–40 (2d Cir.1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir.1983) (en banc). Accordingly, the Attorney General occupies a position similar to that of the United States Attorney and is entitled to the same presumption of impartiality as a "servant of the law."

Nevertheless, a sovereignty, including the United States government, might still face a conflict of interest in a prosecution for criminal contempt, when, for example,

[vigorous advocacy in a related civil context] may cloud the [government] attorneys' ability to distinguish between contempt prosecutions that further their purported primary objective—compliance with the court's order—and those that are driven by a primary motive to further the goals of the underlying litigation. For example, government attorneys may be tempted to pursue a nonmeritorious contempt prosecution because the prosecution would allow them to obtain documents or access to information useful in the underlying civil litigation. They may also be tempted to abandon, press or compromise a prosecution wholly apart from its merits to leverage settlement in the underlying litigation. If their perspective is colored by

involvement with the underlying civil action, then they more closely resemble the "interested parties" in *Vuitton* than impartial U.S. Attorneys.

*F.T.C. v. American Nat'l Cellular*, 868 F.2d 315, 319 (9th Cir.1989).

■ Furthermore, disqualification is required when there is even the appearance of a conflict. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. at 806, 107 S.Ct. at 2137 ("as will generally be the case, the appointment of counsel for an interested party to bring the contempt prosecution in this case at a minimum created *opportunities* for conflicts to arise, and created at least the *appearance* of impropriety." (emphasis in original)).

Finally, the Attorney General will receive no financial benefit, for either his office or the State of New York, from the criminal contempt proceedings. This Court has already indicated that any fines imposed in this criminal proceeding would be deposited into the federal treasury and not paid to the State of New York. Furthermore, this Court has previously announced that it does not intend to award any attorneys' fees to the Attorney General for prosecution of the alleged criminal contempt. Transcript of Proceedings of August 5, 1992 at 12.

The Court now turns to each of the two related civil proceedings, in order to determine whether either creates an actual or apparent conflict of interest for the Attorney General which would require his disqualification from the criminal prosecution of Terry.

1. The Underlying Civil Litigation

■ On July 13, 1992, the Attorney General obtained a preliminary injunction enjoining Terry, among others, from engaging in certain activities. At the present time, the Court is aware of no activity on the part of the Attorney General with respect to the July 13 Preliminary Injunction which would create a conflict of interest. The Attorney General is not currently seeking a modification of the July 13 Preliminary Injunction or its conversion into a permanent injunction. In *United States ex rel. SEC v. Carter*, 907 F.2d 484 (5th Cir. 1990), the court held that the Securities and Exchange Commission ("the SEC") could not be appointed as a special prosecutor in a contempt action while the SEC was "locked in an on-going civil struggle" with the alleged contemnor. *Id.* at 486. The *Carter* court noted that "a pending civil action in which the special prosecutor had an interest 'theoretically could have created temptation to use the criminal investigation to gather information of use in those suits, and could have served as bargaining leverage in obtaining pleas in the criminal prosecution.'" *Id.* (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. at 806, 107 S.Ct. at 2137).

Because the Attorney General is not actively pursuing any claims in connection with the underlying civil litigation, there is not even the appearance that the prosecution for criminal contempt might be used for leverage in the underlying civil litigation or vice versa. This is in marked contrast to the fact patterns in *Vuitton* and *Carter*, where civil claims were pending in the underlying litigation at the time of the criminal contempt investigations and prosecutions.

In addition, as the Attorney General notes, he "cannot derive from this criminal proceeding any practical advantage in the underlying civil action," Memorandum in Opposition at 14, because there has been no grand jury convened to elicit evidence and because the Attorney General has at least as much ability to collect evidence in the civil litigation under Rules 26, 30, 33, 34 and 45, Fed.R.Civ.P., as he does in the criminal prosecution pursuant to Rule 17, Fed.R.Cr.P.

Furthermore, while the Attorney General has sought to be reimbursed for the attorneys' fees and costs associated with the underlying preliminary injunction, Amended Complaint at 25, any recovery would go directly into the general coffers of the State of New York. The Attorney General has represented that he would reap no direct institutional gain from this recovery of expenses. September 24, 1992 Oral Argument Tr. at 28. The only financial interest

the Attorney General conceivably might have in the underlying civil litigation is in increased general state revenues. This interest is simply too remote to require disqualification. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 250–52, 100 S.Ct. 1610, 1617–18, 64 L.Ed.2d 182 (1980). Finally, the Attorney General has not sought any damages in the underlying civil action.

In conclusion, on the facts of this case, the Attorney General's involvement in the underlying civil litigation does not create a conflict of interest, real or potential.

### 2. The Concurrent Civil Contempt Proceedings

■ In the instant matter, the civil contempt proceedings also present no conflict of interest, real or potential, for the Attorney General. As an initial matter, the purposes of civil and criminal contempt proceedings, while different, are convergent. A civil contempt proceeding is remedial and intended to coerce the contemnor, while a criminal contempt proceeding is designed to vindicate the authority of the court. 3 Charles A. Wright, *Federal Practice and Procedure* § 704 (1982). Nevertheless, criminal contempt has the same incidental effect as civil contempt and *vice versa:*

> In contempt cases, both civil and criminal relief have aspects that can be seen as either remedial or punitive or both: when a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order.

*Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 635, 108 S.Ct. 1423, 1431, 99 L.Ed.2d 721 (1988); *see Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 443, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). Therefore, the *Vuitton* court's concern that the prosecutor in a criminal contempt proceeding not be placed in a position where he must "serve two masters" *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. at 814, 107 S.Ct. at 2141, is simply not an issue when the source of conflict is the prosecution of both civil and criminal contempt.

■ Furthermore, as indicated above, all charges of civil contempt against Terry have been dismissed and Terry's counsel does not represent any of the defendants in the civil contempt proceedings. Accordingly, there is no opportunity for the Attorney General to use this criminal contempt prosecution to pressure Terry to settle any civil contempt proceeding.

The Attorney General will reap no financial gain, for either himself or the State of New York, from the civil contempt proceedings. This Court has already indicated that any fines imposed in the civil contempt proceedings would be made payable to the United States and not the State of New York. In addition, consistent with its oral decision rendered July 24, 1992 and judgment dated August 5, 1992 in *People of the State of New York v. Operation Rescue National*, 92 Civ. 4884 (RJW), this Court does not intend to award attorneys' fees in the civil contempt proceedings, even if the Attorney General prevails in those proceedings. Because the Attorney General has no financial interest in the outcome of either the civil or criminal contempt proceedings, there is no reason to disqualify him on this ground.

Finally, as with the underlying civil action, the Attorney General is not in a position to acquire evidence under the Federal Rules of Criminal Procedure that cannot presently be acquired pursuant to the Federal Rules of Civil Procedure.

For these reasons, the Court finds that the Attorney General's involvement in the concurrent civil litigation pending before this Court does not make the Attorney General an "interested party" under the standards of *Vuitton* and its progeny. Accordingly, disqualification is not required as a result of this involvement.

### B. *Robert Abrams' Alleged Personal Animosity Toward Randall Terry*

Terry asserts Abrams' alleged gestures on April 5, 1992 indicate overt hostility toward Terry and require the disqualification of the Attorney General. In their sub-

missions to the Court, the parties do not provide any case law concerning the standards to be used in determining whether a publicly-expressed "statement" of the sort attributed to Abrams requires disqualification of a prosecutor.

While a prosecutor must harbor no *personal* animosity, he need not be disinterested on the question of whether a defendant is guilty. As the Second Circuit has written:

> The concept [of a "disinterested" prosecutor] is not altogether easy to define. Of course, a prosecutor need not be disinterested on the issue whether a prospective defendant has committed the crime with which he is charged. If honestly convinced of the defendant's guilt, the prosecutor is free, indeed obliged, to be deeply interested in urging that view by any fair means. True disinterest on the issue of such a defendant's guilt is the domain of the judge and the jury—not the prosecutor. It is a bit easier to say what a disinterested prosecutor is not than what he is. He is not disinterested if he has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged.

*Wright v. United States,* 732 F.2d 1048, 1056 (2d Cir.1984) (citation omitted), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985).

Terry's allegations concerning Abrams' gestures on April 5, 1992, if true, suggest that Abrams *may* have a personal "axe to grind" against Terry. For this reason, the Court conducted an evidentiary hearing on November 18, 1992, at which Randall Terry, Jeff White, Diane Schulder Abrams and Robert Abrams testified. Each of these individuals provided testimony consistent with his or her affidavit or declaration. On the basis of this testimony, the Court finds that (a) neither the prosecutor nor the defendant has established that his version of the events of April 5, 1992 is true and (b) even if the Court accepts Terry's and White's version of the facts as true, the gesture and comment made by Abrams toward the defendant was of no more than five seconds duration and does not demonstrate that Abrams harbors a personal animosity toward Terry.

Defendant also asserts that Abrams' personal animosity is evidenced by a television commercial Abrams ran repeatedly during his primary campaign to become the Democratic nominee for a United States Senate seat from New York.[4] As a voice-over says, "[w]hile Abrams stood up to the anti-abortion extremists, Ferraro was silent," the viewer sees an unidentified newspaper headline which reads, "Abrams to prosecute Operation Rescue chief." On the basis of this commercial, defendant argues that, "[n]ot only does the Attorney General harbor a deep seated enmity toward Randall Terry, the Attorney General also seeks to parlay any prosecution of Randall Terry into political gain." Defendant's Reply Memorandum at 5.

This television commercial demonstrates no personal animosity on the part of Abrams. The newspaper headline simply states a fact in objective terms and indicates no prejudice. While the use of the classification "anti-abortion extremists" makes clear Abrams' view of the activities of Terry and his colleagues, such a word choice appears to represent a professional opinion by Abrams concerning the general tactics used by Terry and others affiliated with Operation Rescue. It simply does not rise to the level of a *personal* "axe to grind."

Finally, the undisputed fact that Abrams sought to obtain political gain from his prosecution of Terry is not enough to disqualify him. There is no evidence that potential political gain was the motivating force behind the Attorney General's decision to prosecute, rather than a by-product of his participation in the prosecution.[5] Indeed, it was this Court, not the Attorney General, which: (1) indicated that criminal, not civil, contempt was appropriate with

---

**4.** While Abrams did win the Democratic nomination, he did not win the 1992 general election.

**5.** At the November 18 evidentiary hearing, defendant also relied on several newspaper articles, published during the Senate campaign,

respect to Terry and (2) in light of the United States Attorney's decision not to prosecute, asked the Attorney General to prosecute the criminal contempt. If, as is the case here, a prosecutor believes that a charged defendant has violated the law, it does not demonstrate personal prejudice for that prosecutor to inform the voters of his efforts to "bring [that] defendant to justice with respect to the crime with which he is charged." *Wright v. United States,* 732 F.2d at 1056.

In summary, Terry has failed to demonstrate personal animosity on the part of Abrams. Accordingly, the Attorney General should not be disqualified on this ground.

### CONCLUSION

For the reasons stated above, the Court finds that the Attorney General is not an interested party under the standards set forth in *Vuitton.* In addition, Randall Terry has failed to prove that Robert Abrams harbors a personal animosity against him. Therefore, defendant's motion to disqualify is denied.

It is so ordered.

---

containing quotes from Abrams concerning his involvement in this prosecution. As with the television commercial, these quotes do not demonstrate personal animosity. In this Court's view, they merely seek to explain to the public Abrams' record as Attorney General.